UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION


ROY EILTS,                          )
                                    ) **Case Number 21-2066**
                    Plaintiff,      )
                                    )
         vs.                        )
                                    ) June 3, 2024
                                    ) 10:32 a.m.
MENARD, INC.,                       )
                                    )
                    Defendant.      )




**FINAL PRETRIAL CONFERENCE**


**BEFORE THE HONORABLE COLIN S. BRUCE**
United States District Judge




Court Reporter (present remotely):

LISA KNIGHT COSIMINI, RMR-CRR
U.S. District Court
201 South Vine
Urbana, Illinois 61802


Proceedings recorded by mechanical stenography;
transcript produced by computer.

A P P E A R A N C E S :


For the Plaintiff:   **JEFFREY D. NAFFZIGER, ESQUIRE \***
                     **BRIANNA HUNTER LONG, ESQUIRE \*\***
                     O'CONNOR LAW FIRM, LTD.
                     100 South Wacker Drive, Suite 350
                     Chicago, Illinois 60606
                     773-469-1727
                     jnaffziger@koconnorlaw.com
                     blong@koconnorlaw.com




For the Defendant:   **W. ANTHONY ANDREWS, ESQUIRE \***
                     **JOSEPH SCOTT DAVIDSON, ESQUIRE \***
                     OTTOSEN DiNOLFO
                     HASENBALG & CASTALDO, LTD.
                     1804 North Naper Boulevard
                     Suite 350
                     Naperville, Illinois 60563
                     630-682-0085
                     wandrews@ottosenlaw.com
                     jdavidson@ottosenlaw.com













 \* Personally present in court
\*\* Appeared remotely

```
 1                   (In virtual courtroom, 10:32 a.m.)
 2           COURTROOM DEPUTY:  This is Case 21-2066,
 3   Eilts v. Menard, Inc., et al.
 4           THE COURT:  Since we're not on Zoom with a
 5   nice little caption underneath to tell me who everybody
 6   is, other than Brianna Long, you're going to have to
 7   tell me.  You're Mr. O'Connor?
 8           MR. NAFFZIGER:  I'm Jeff Naffziger.
 9           THE COURT:  All right.  Jeff Naffziger on
10   behalf of ....
11           We get so used to Zoom.
12           Wait a second.  Have you entered your
13   appearance here?
14           MR. NAFFZIGER:  Yes.  It's Naffziger.  It's
15   N-a-f-f--
16           THE COURT:  Oh, there it is.  There it is.
17   You're farther down on the list than I thought.  Okay,
18   Jeff Naffziger on behalf of the plaintiff.
19           And you, gentlemen?
20           MR. ANDREWS:  Good morning, Your Honor.  Tony
21   Andrews and --
22           MR. DAVIDSON:  Good morning, Your Honor.
23   Joseph Davidson.
24           MR. ANDREWS:  On behalf of the defendant,
25   Menard, Incorporated.
```

1          THE COURT:  All right.  And then we have

2    Brianna Long appearing by video as well on behalf of

3    the plaintiff.

4          All right.  Well, in a lot of ways, gentlemen,

5    I'm glad you got to sit here through some of my

6    hearings this morning.  You can see what my schedule is

7    like.

8          So, as things stand right now, we are set for

9    trial on June 25th.  If you see me set another status

10   hearing, it's because somebody later on today -- and I

11   have a full day of hearings today and Friday -- it

12   means some criminal defendant who none of us thought

13   was going to go to trial is going to trial and has

14   bumped you out because I have to take criminal before

15   civil.

16         Now, I have no way of knowing what they're

17   going to do.  As you can see, some of these criminal

18   hearings are pretty free-wheeling.  I never know what's

19   going to occur.  So that's just a heads-up.  If you see

20   a status hearing, that indicates that we are probably

21   going to move the trial.

22         Before anybody says, *Judge, is there any way*

23   *we can have a firm trial date?*, the only way you can

24   get a firm trial date is if you consent to the

25   magistrate judge.  That requires both parties.  If you

 1    wish to do so, the form is on the website.  Simply take

 2    the form, fill it out, and file it.  And I always sign

 3    it "yes" because I'm the only district judge in Urbana,

 4    so I have to handle all the criminal from Kankakee,

 5    Champaign, Danville, Decatur, Mattoon-Charleston, all

 6    points south, and all the other counties in between.

 7              All right.  Assuming we start, we're going to

 8    start on June 25th.  In reviewing the pretrial order, I

 9    think this is about a four-day case at the most.

10              Do you agree with that, Mr. Naffziger?

11              MR. NAFFZIGER:  Yes.

12              THE COURT:  You think four days?

13              MR. ANDREWS:  Yes, Your Honor.

14              THE COURT:  Okay.  Who's going to be at the

15    plaintiff's counsel table?

16              MR. NAFFZIGER:  It will be me and then

17    Ms. Long.

18              THE COURT:  Okay.

19              And who's going to be at defense?

20              MR. ANDREWS:  Same:  Mr. Andrews,

21    Mr. Davidson, and we'll have a client representative,

22    which -- a court representative, which -- have they

23    appointed him yet?  I anticipate it to be Mr. Douglas,

24    but corporate hasn't made the final decision yet.

25              THE COURT:  You can tell me the morning of

1  jury selection.  I just have to advise the jury who the

2  people at the table are.  So I'm not going to worry

3  about that.

4         All right.  Anybody going to have any

5  paralegals or anybody else for evidence presentation?

6         MR. NAFFZIGER:  I don't believe so for

7  Plaintiff.

8         Oh, but my client will be here, too,

9  obviously.

10         THE COURT:  Right.

11         MR. NAFFZIGER:  I'm sure you assumed that.

12         THE COURT:  And I'm sure I'm going to

13  mispronounce your client's name about three or four

14  times, so get ready for me to ask you that.

15         MR. DAVIDSON:  We've been the lawyers in the

16  case, and we still can't get it right.

17         THE COURT:  All right.

18         Are you guys going to use any paralegals for

19  the defense?

20         MR. ANDREWS:  Nope.

21         THE COURT:  All right.

22         I read the statement of the case.  I'm going

23  to modify that slightly to make it more user-friendly.

24  But, frankly, it's pretty good.  I mean, usually I

25  get -- not usually.  Oftentimes, I get statements of

```
 1   the case that cite cases in them and cite statutes, and
 2   I can't read that to the jury.  So I just read to them
 3   a very basic statement; and that's, that's pretty
 4   straightforward, so I'm probably going to use that.
 5          I looked at the stipulations.  Have either
 6   side -- have you given thought to when you'd like me to
 7   read those?  I can read them either before opening
 8   statements.  I can read them after opening statements.
 9   Or I can read them periodically during the trial as
10   they're appropriate and relevant.
11                    (Inaudible comment by unidentifiable
12                    counsel.)
13          THE COURT:  Anybody given any thoughts on
14   that?
15          MR. ANDREWS:  I was deferring to counsel, but
16   my suggestion is:  I don't think we really need these
17   read, the fact that they own the store, the fact that
18   he was a, you know, a visitor.
19          THE COURT:  Okay.
20          MR. ANDREWS:  But it's up to counsel.
21          MR. NAFFZIGER:  Opening statements is, I
22   think, a logical time to read them.  And then if
23   something comes up during trial, can we ad hoc --
24          THE COURT:  Yep.
25          MR. NAFFZIGER:  -- request that, Your Honor?
```

```
 1            THE COURT:  What I'm going to do is -- I'm
 2    going to put down a note here that says Ask about
 3    reading stipulations before jury selection.  Between
 4    now and then, you can figure out -- if you just want me
 5    to read a few of them, just let me know before, before
 6    we finish jury selection, before we make opening
 7    statements.
 8              (Brief pause in proceedings.)
 9            THE COURT:  All right.  Witness lists.  I'll
10    verify who you're going to call the morning of jury
11    selection.  I read those lists to the jury.  I don't
12    identify on whose behalf they're being called, but I do
13    read all names to the jury pool to find out if anybody
14    in the pool knows any of the potential witnesses.
15            Anybody going to have a witness by deposition,
16    video or otherwise?
17                  (Two unidentifiable attorneys speaking
18                  inaudibly at the same time.)
19            THE COURT:  Somebody speak.
20            MR. NAFFZIGER:  There are two, Judge, by
21    agreement that are by video because they're outside of
22    the Court's jurisdiction.
23            THE COURT:  I mean, actual depositions or just
24    witnesses?
25              MR. NAFFZIGER:  Depositions that are by video.
```

1              THE COURT:  Okay.

2              MR. NAFFZIGER:  They were already recorded.

3              THE COURT:  Okay.  So we've already got -- we

4   have two video depositions.

5              MR. NAFFZIGER:  And, Judge, if I could -- if

6   it would be a good time to raise one issue that we were

7   not able to get agreement on -- I think actually the

8   parties have done a really a good job of reaching

9   agreements, --

10             THE COURT:  Good.

11             MR. NAFFZIGER:  -- which I think is

12  refreshing.

13             The one thing we could not agree on is

14  Plaintiff proposed that the treating surgeon and

15  perhaps the billing witnesses would be able to testify

16  by live Zoom so they would not have to travel to court.

17  We would request leave to do this if the Court --

18             THE COURT:  That's, that is -- we do that all

19  the time nowadays.  Post-pandemic, that's more the norm

20  that -- is there a reason you want them here live?

21             MR. ANDREWS:  No, Judge.  I didn't know what

22  technology capabilities we had here.  That's one reason

23  I came down here today, to see how this all works.

24             THE COURT:  Oh, yeah.

25             So, as you can see, we do Zoom witnesses all

1    the time.  In civil cases; can't do it in criminal.  In

2    civil cases, we do Zoom witnesses a lot, so ....

3            Okay.  Does that answer your question?  So

4    there's no -- all right.  So we're going to have a

5    few -- yeah, as far as that goes, all you need to do is

6    coordinate with -- when they're going to be available.

7    You know, kind of guesstimate at what point in time.

8            The last thing I want to do is have somebody

9    say, *Well, our next witness is by Zoom, but they're*

10   *currently grocery shopping* or something, which actually

11   happened.  Don't, don't do that.  Make sure they know

12   we're ready and they're available.

13           And nobody's in custody.  So I don't have to

14   worry about making sure that person has available

15   video, so that's good.

16           MR. NAFFZIGER:  At least not yet.

17           THE COURT:  Yeah.  That's a nice change of

18   pace for me.

19           MR. NAFFZIGER:  Should we use Zoom, or is it

20   the platform that the Court uses that we should use?

21   Or does it matter?

22           THE COURT:  Looking at my courtroom deputy

23   because she's in charge of all of this.

24           COURTROOM DEPUTY:  It's Zoom.  I can give you

25   the instructions for how to connect through our Zoom.

```
 1              MR. NAFFZIGER:  Go through yours?

 2              COURTROOM DEPUTY:  Yes.

 3              MR. NAFFZIGER:  Wonderful.

 4              THE COURT:  You know, just dial in and it

 5    appears here, and everything works fine.  It's pretty

 6    normal.

 7              All right.  The exhibit lists look good.  In

 8    case anybody adds any other exhibits or anything later

 9    on if it happens during the trial, my only request is:

10    Try to be consistent in whatever structure you use to

11    identify your exhibits.

12              And I say that because it helps out my

13    courtroom deputy.  It helps me out.  It helps my court

14    reporter out.  And while all of us think it's obvious,

15    it is stunning how oftentimes we get people saying they

16    have Exhibits 1, 2, and 3 followed by A followed by

17    Roman numeral V.  Don't do that.  So stay consistent.

18    If you have 1 and then you decide to add another

19    exhibit, just make it 1A or 1B or 1.5 or something like

20    that.  Just be consistent.

21              Make sure the exhibit, if it's substantive

22    evidence, is admitted before you show it or publish it

23    to the jury.

24              You're all experienced attorneys.  I'm not

25    even going to lecture about the difference between
```

 1   substantive, impeachment, and demonstrative exhibits.

 2   I'm not going to do -- you know, I presume everybody

 3   knows the difference between those types of exhibits:

 4   substantive, impeachment, and demonstrative.

 5           All right.  Let me tell you about the jury

 6   selection process.  For a civil trial, we call fourteen

 7   people into the box.  We've got ....

 8                    *(Discussion off the record between the*

 9                    *Court and the courtroom deputy.)*

10           THE COURT:  We're going to have some people in

11   reserve.  I don't know how many because we ....

12                    *(Discussion off the record between the*

13                    *Court and the courtroom deputy.)*

14           THE COURT:  All right.  So we're going to

15   have, it sounds like, about 25 people here total if

16   everybody shows.

17           We'll put fourteen in the box.  I ask general

18   questions as to the civil process, about the case,

19   potential witnesses, make sure they have all of the

20   correct -- neutral attitude; they're not predisposed

21   towards one side or the other.  Then I go through and

22   ask specific questions to each juror.

23           I let the attorneys have complete jury books.

24   They have the questionnaires that all the jurors have

25   filled out, so -- and they're identified by their juror

 1  number at the bottom, which means, in effect, between

 2  what's in the questionnaire and the questions that I

 3  ask, that should cover anything that would be

 4  appropriate to inquire of any juror.

 5          In other words, once I'm done asking questions

 6  and once you're done looking at the juror

 7  questionnaires, I do give people the ask -- the chance

 8  to ask follow-up questions, but normally there aren't

 9  any.

10          If you do want to ask a follow-up question, my

11  only request is that it's actually a true follow-up

12  question.  Do not launch into an argument disguised as

13  a question or any type of indoctrination.  In short, I

14  would be shocked if you have additional questions you

15  need to ask.

16          It does happen sometimes, as the example I

17  usually give.  For example, say we have somebody who is

18  from a rural area and they work at XYZ factory and all

19  of us up here know XYZ factory makes widgets.  And all

20  of you are looking, saying:  *What the hell is XYZ*

21  *factory?*  An appropriate follow-up question would be:

22  *Mrs. Smith, you said you work at XYZ factory.  What do*

23  *you do there?*  Or *What does that do?*  That's fine.

24          An appropriate question would not be something

25  like:  *Don't you believe there are too many lawsuits in*

 1    *the United States?  Or Don't you believe people should*

 2    *sue more often?*

 3             Don't, don't do things like that.  All right?

 4    Don't do it.  I'll cut you off, and it's usually very

 5    embarrassing, and you lose credibility in front of the

 6    jury.  So don't -- don't do that.

 7             All right.  So once I'm done with all the

 8    questions, I'll excuse the venire.  I'll take any

 9    strikes for cause.  In a civil case, that's unlikely.

10    If somebody does need to be stricken, I usually take

11    care of it without any motion from either side.

12             Assuming there's no strikes for cause, then,

13    I'll take a brief break.  You can go through and choose

14    who you want to strike.  We then have a -- after a

15    short break, we start doing peremptory strikes.

16    There's three strikes per side.  They alternate,

17    Plaintiff going first.  So it's Plaintiff, Defendant,

18    Plaintiff, Defendant, Plaintiff, Defendant.

19             You are not required to use all of your

20    strikes if you don't want to.  You can pass.  If you

21    pass, you lose that strike.  If everybody uses -- both

22    sides use all three of their strikes, we have fourteen

23    in the box.  Fourteen minus six is eight.  We have a

24    jury of eight.  If, theoretically -- and it's never

25    happened in a civil case -- if, theoretically, nobody

 1    used any strikes whatsoever, we'd have a jury -- keep

 2    all fourteen in the box, and we'd have a jury of

 3    twelve, and the last two people would be two

 4    alternates.  It's that straightforward.

 5          Any questions about jury selection?  It's

 6    pretty easy.

 7          In terms of timing, in case you're worried

 8    about witnesses, I am one of the fastest jury-selecting

 9    judges in the district.  We usually get done with a

10    civil jury well before lunch and usually do opening

11    statements before lunch.  A lot of it depends upon any

12    issues that might arise with the jury.  And I mean,

13    like, personal issues:  if somebody comes in late, if

14    somebody needs to use the restroom, et cetera, as well

15    as my staff, how my court reporter and courtroom deputy

16    are doing.  But usually we can get opening statements

17    in before lunch, and then we start with the witnesses

18    after lunch in civil cases.

19          All right.  I see there's some proposed voir

20    dire.  I haven't looked at that yet.  I'll enter an

21    order about the voir dire sometime before our trial

22    date.  As you can see, I'm a little busy.  Without even

23    looking, I'll tell you:  Most of the time, I don't

24    usually accept voir dire questions because they're

25    encompassed either within the questionnaire or with the

*Roy Eilts v. Menard, Inc., ILCL No. 21-2066 -- Final Pretrial (06-03-2024)*

```
 1    questions I already ask.  But I'll get you an order

 2    about that.

 3            As far as jury instructions go, I synthesize

 4    the Court's own instructions.  That usually tends to be

 5    the most efficient way to do it.  I do that by taking

 6    both sides' instructions and any Seventh Circuit

 7    Pattern instructions that are applicable.  I put them

 8    together.  I will provide them to you in time for you

 9    to have a meaningful review of them.  I want you to

10    read through them so that we can have a worthwhile jury

11    instruction conference.

12            If there's a Seventh Circuit Pattern

13    Instruction versus an IPI Instruction, I take the

14    Seventh Circuit Instruction almost every time, just

15    FYI.

16            All right.  As far as court hours go, we try

17    to start most days a little bit after 9:00 -- so

18    between 9:10 and 9:15.  We do that because -- I

19    obviously don't know who's going to be on our jury, but

20    we go to far northern Kankakee County, and we go to far

21    south Coles County and even over by the Indiana border,

22    and we go to far Macon County.  So we do have some

23    people that are driving on rural roads for several

24    hours to be here.  So I used -- you know, I tried being

25    a hard guy by saying *Let's start at 8:30*.  Then it
```

Roy Eilts v. Menard, Inc., ILCL No. 21-2066 -- Final Pretrial (06-03-2024)

1   became 8:45.  Then it became 9:00.  And I've accepted

2   the reality that if I have the attorneys in here a

3   little after 9:00, like at 9:10/9:15, usually the last

4   jurors trickle in about that time.  We can start around

5   that time.  So, you don't have to worry about blazing

6   in here at 8:45 because we're not going to start then.

7           For the same reason, we try to leave around

8   4:00.  We're almost certainly going to have some jurors

9   who have an hour-plus drive.  So I'll let them get home

10  hopefully before 6:00/6:30.  If we stay a little bit

11  longer, that's not uncommon.  We may stay until

12  4:30-ish.

13          Let's see.  I've got attorneys on both sides,

14  so I don't have to give time limits for opening

15  statements and closing arguments, which is again

16  refreshing.  That's nice.  Oftentimes I have *pro se*

17  people, so I like having good attorneys on both sides.

18          All right.  Courtroom technology.  Obviously,

19  you've seen we use Zoom a lot.  If you have laptops you

20  want to bring to present your evidence, my courtroom

21  deputy can show you how we can plug in.  You can just

22  go directly from your laptop to the projector.  The

23  jury can see evidence that way.

24          We also have an overhead projector that comes

25  out of that podium there in the middle.  She can show

```
 1   you how to use the projector if you want to use that.
 2   That's kind of old school, but it still works.
 3            MR. ANDREWS:  I'm old school, Judge.
 4            THE COURT:  Okay.  You're old school.
 5            MR. ANDREWS:  One of those ELMO things?
 6            THE COURT:  We have an ELMO thing.  We have an
 7   overhead projector.  It slides out.  It has an
 8   electronic zoom.  It works really very well.  So we can
 9   do that.
10            MR. ANDREWS:  That's funny we call that old
11   school, you know.
12            THE COURT:  Well, one time I had some law
13   students in here doing a trial and I said "ELMO," and
14   they looked at me -- they gave me what my, what my
15   college-aged daughter would refer to as the Labrador.
16            What are you talking about?
17            And I said:  An ELMO, an overhead projector.
18   No?  Okay.  It's a device that shines a light down and
19   reflects it.
20            So we have that.
21            Okay.  Let's see, anything else here?
22            I don't have to worry about people being in
23   civilian clothes.
24            I don't have to worry about people being
25   shackled.
```

```
 1            If you do have exhibits, physical exhibits or
 2   otherwise, if you'd bring a flash drive with your
 3   exhibits and have that available to provide to the
 4   Court, that -- at the end of the trial; you don't have
 5   to do it right away; at the end of the trial -- that
 6   really helps also because then we have an electronic
 7   copy of the physical exhibits that were admitted.
 8            MR. NAFFZIGER:  Do you have, like, the normal
 9   USB or the smaller ones we're using now or both?  Just
10   so I bring in the right thing.
11            COURTROOM DEPUTY:  [Inaudible.]
12            MR. NAFFZIGER:  Okay.
13            COURTROOM DEPUTY:  [Inaudible.]
14            THE COURT:  We'll have to have physical
15   copies.  The thumb drives are to -- look, our IT
16   department is really good.  So if you brought
17   something -- if you brought in like a little needle
18   thing, they'd probably have an adapter for it.  They
19   stun me with how much stuff they do, so ....
20            Now, if you brought in a five and a quarter
21   floppy, I'm not sure we could find a drive that that
22   would fit in.
23            MR. NAFFZIGER:  Yeah.
24            THE COURT:  Okay.  That's it.
25            Anybody else have any questions?  Anything?
```

```
1           MR. NAFFZIGER:  So just -- I just keep
2    interrupting.  And should I stand, Judge?  I --
3           THE COURT:  You don't have to stand.  We don't
4    have a jury here.
5           MR. NAFFZIGER:  Okay, okay.  So, one issue is
6    that I had a conversation with defense counsel on
7    Thursday and Friday, and they mentioned they might be
8    waiving jury.  And so it would be --
9           THE COURT:  Oh, don't -- okay.  Go ahead.
10   Then I'll give you my speech.  Go ahead.
11          MR. NAFFZIGER:  Okay.  Sorry.  I don't want
12   to -- I don't want to incur a speech, but I did want to
13   ask:  Can we set a deadline for Defendant to make a
14   decision on that?  Because that will affect a lot of
15   the things in terms of whether we need jury
16   instructions, voir dire, all that good stuff.  And it
17   could shorten the trial.
18          THE COURT:  Okay.  Let me give you my speech
19   about bench trials.  I think -- it was actually really
20   good both sides were here because you got to see what
21   my calendar is like.
22          That's my court reporter, Lisa.
23          Lisa, you want to wave?
24          She's my only court reporter.  On top of that,
25   the other judges frequently try to borrow her because
```

Roy Eilts v. Menard, Inc., ILCL No. 21-2066 -- Final Pretrial (06-03-2024)    21

1    she's wickedly good.  She works for me.

2            Now, if you waive jury trial, then that means

3    that before I can do anything, we have to get

4    transcripts from my court reporter for both sides.

5    That is not something that's done very quickly because

6    when she's -- she's in court with me all the time.  And

7    you can imagine everybody wants transcripts of

8    everything -- especially criminal -- and criminal takes

9    priority over civil.  If you don't like that, talk to

10   the Seventh Circuit Court of Appeals.  So, sentencing

11   transcripts, suppression hearing transcripts, criminal

12   trial transcripts, et cetera.

13           So when your trial is done, when she has time,

14   she will do the transcripts.  Just to give you an idea

15   of the time frame we're talking about, it could be four

16   months.  It could be six months.  After the trial,

17   you'll get the transcripts.

18           Then I have both sides give me proposed

19   findings of fact and conclusions of law.  Each side

20   gets at least 60 days.  In my experience, everybody

21   asks for an extension, so it turns out being closer to

22   90 or 120 days for each side.

23           So now we're almost -- we're approaching

24   getting close to a year after the trial.  Once that's

25   done and I have time, I have to have -- my law clerk

1    and I go through all the transcripts, all the proposed

2    findings of fact and conclusions of law, and then I

3    have to issue a lengthy written order per the Seventh

4    Circuit.  So you will probably get a decision from me,

5    if you decided to do a bench trial, more than a year

6    after the trial.

7           And then since, in a bench trial, other than

8    credibility findings, my findings are reviewed *de novo*

9    by the Seventh Circuit, it is essentially saying you

10   want to gamble on doing the whole trial over from the

11   get-go, from the start.  Because other than me making

12   credibility findings, it's a *de novo* review at the

13   Seventh Circuit.  If they don't like the conclusions I

14   make, they can make other conclusions, make other

15   findings, and reverse and remand for a new trial.  And

16   after a year and a half plus -- plus whatever time it

17   took for the appeal -- you're back to where you were

18   before.

19          That's my speech about why you probably don't

20   want to do a bench trial.  And just so you know, I'm

21   finishing up a bench trial order on a trial that was

22   done 19 months ago right now.  I'm going to hopefully

23   get it done later on this week.  So I'm not just making

24   stuff up.  I mean, that's for real.  So that's the

25   speech.

1          Thoughts?

2          MR. ANDREWS:  No.  Other than I am -- I am

3   disappointed to hear you can't rule on the whim, right

4   as you, you know, see the evidence come in, but that

5   you need a transcript and you have to have a written

6   order.

7          THE COURT:  There was a time back when I would

8   make rulings without doing written orders.  With the

9   current composition of the Seventh Circuit, it is

10  foolish to do so, so ....

11          Yeah, they want to know how we came up -- how

12  I came up with this, how I came up with that.  And

13  they'll ask for the transcripts anyway, so both

14  sides -- if there's any appeal.  I'll want you to cite

15  to the transcripts, all the places -- listen, it's

16  easier just to do it from the beginning, so ....

17          All right.

18          MR. ANDREWS:  Okay.  That's helpful.

19          THE COURT:  Please write to the Seventh

20  Circuit and tell them we should go back to doing it at

21  the time.  I would like that.

22          All right.  Any other questions?

23          MR. ANDREWS:  Yes.

24          THE COURT:  All right.  Go ahead.

25          MR. ANDREWS:  The issue of the jury waiver

```
 1   came to light about Thursday or Friday as we were

 2   talking because what prompted it is counsel suggested

 3   that he wanted to call in his case-in-chief every

 4   single one -- or next to every single one -- of my

 5   witnesses just so he could parade them in here for a

 6   few minutes; and then I had to call them back on my day

 7   Thursday.

 8           THE COURT:  Okay.  I can tell you right now

 9   that I don't -- I don't do the back and forth.  If

10   they're on your witness list, I'll let you -- in order

11   to make things more efficient, I let you ask your

12   questions also at the same time.

13           MR. ANDREWS:  All right.  Well, that makes it

14   easier.

15           So there's no scope objections?

16           THE COURT:  Nope.

17           MR. ANDREWS:  Okay, okay.  That's good.

18   And --

19           THE COURT:  It wastes too much time.  I mean,

20   if you -- we got four days, gentlemen.  If you -- we

21   have come in on Saturdays; and if we go over on Friday,

22   we come in on Saturday, which makes everybody unhappy,

23   including the jury.

24           But -- let me make sure I'm correct before I

25   say this.
```

```
 1              (Brief pause in proceedings.)
 2          THE COURT:  Yeah, we've got a criminal trial
 3   starting the week of July 4th, that Tuesday, so -- and
 4   that Monday is full hearings.  So, basically, we'll go
 5   straight through.  If we have to go into Saturday,
 6   we'll go into Saturday.  And then if we don't get done
 7   then, you'll probably have -- I don't know if we have
 8   anything on Friday the 5th, but we'll have to find
 9   another date to continue the trial.
10          So we try to make things as efficient as
11   possible.  If either side calls -- well, if the
12   plaintiff calls defense witnesses in their
13   case-in-chief, I'll let defense ask all their questions
14   if they're outside the scope.
15          MR. ANDREWS:  Okay.  Yeah.  When I was doing
16   the math, Judge, exactly how I was getting there, I
17   wasn't sure we'd get done by Friday if we do that math.
18   So that's what prompted it.
19          THE COURT:  No.
20          MR. ANDREWS:  The other question I have for
21   the Court is:  I think -- if we're talking about
22   fast-tracking or moving this along, I propose we
23   bifurcate liability from damages because this is a
24   liability contest that needs a decision.  And,
25   theoretically, we wouldn't have to depose -- I mean,
```

1   produce four witnesses.  We have -- I think it's four

2   experts -- three or four experts -- on damages, plus

3   the treaters and all the billing people.  This could be

4   a two-day liability trial if Your Honor is inclined to

5   bifurcate.

6           THE COURT:  I don't bifurcate because in my

7   experience it wastes the jury's time.  I've tried to

8   bifurcate before, thinking it was going to save time.

9   It has not.

10          Now, based on both questions that were just

11  raised about the bench trial and about the bifurcation,

12  recall at the very beginning when I told you if you

13  want a firm trial date you should consent to the

14  magistrate judge?

15          The same thing applies because, by law --

16  well, by the U.S. Constitution -- magistrate judges

17  can't do criminal.  So you run into a problem with the

18  court reporter because it's Lisa.  She waved before.

19  The same court reporter would do the trial in front of

20  the mag-- actually, I don't know if that's true.

21          If you're with me, Lisa, you'd get a

22  substitute court reporter for Judge Long?

23          COURT REPORTER:  Yes.

24          THE COURT:  So if you wanted to go the bench

25  trial route or the bifurcation route, if you went

Roy Eilts v. Menard, Inc., ILCL No. 21-2066 -- Final Pretrial (06-03-2024)    27

```
 1   before Judge Long, that becomes a much more viable
 2   option because he doesn't have the time pressure that I
 3   do with the criminal cases.  So if you, if you all want
 4   to talk about this later on and decide, just don't -- I
 5   mean, we're -- so when are we going to call the jurors
 6   in for this one?
 7             COURTROOM DEPUTY:  Thursday, --
 8             THE COURT:  Thursday the 20th?
 9             COURTROOM DEPUTY:  Yes.
10             THE COURT:  So if you're going to go that
11   route, you should probably -- well, I'll set a
12   deadline.  If you want to go that route, do so -- let
13   me know by noon on Thursday the 20th; Thursday,
14   June 20th.  Because we're going to advise the jurors to
15   come in -- on the evening of June 20th, a formal call
16   will be set up for them to call in, and they'll be told
17   to come.  So, in the words of whatever TV show that
18   was:  *Talk amongst yourselves*.  If you want to go that
19   route, that's fine.  But that does open up more
20   possibilities, so ....
21             All right.  Any other questions?
22             MR. ANDREWS:  There are two outstanding
23   motions in limine, Judge, of -- that impact my experts.
24   One is fully briefed.  That's on my building expert,
25   Barb King.  I --
```

```
 1              THE COURT:  I can tell you this:  I don't -- I
 2   will turn my attention to this case probably after my
 3   next criminal trial, and I've got a civil trial
 4   starting tomorrow, a pro se prisoner.  Once I get done
 5   with that and the next criminal trial, then I'll turn
 6   my attention to your case.  I try to get these orders
 7   out fairly quickly.  If I have time this week -- it's a
 8   pro se case -- if it gets done early, I'll probably
 9   focus on your outstanding motions.
10              So both of them are fully briefed?
11              MR. ANDREWS:  No.  The one on Barb King is
12   fully briefed.  You gave us through July -- or
13   June 11th to brief the other one on Dr. Bresch.
14              THE COURT:  Okay.  So when those are in, I'll,
15   I'll -- I'll get you a ruling before trial.
16              MR. ANDREWS:  There are other motions in
17   limine that need brief discussion -- or just a ruling,
18   I suppose -- but most of them --
19              THE COURT:  Yeah.  I'll enter a ruling before
20   we start trial.  You'll get a written order.  I take
21   care of all those.
22              Okay.  Anything else?  Either side?
23              MR. NAFFZIGER:  Not from Plaintiff.
24              MR. ANDREWS:  Will we have access to witness
25   rooms, Judge?
```

1          COURTROOM DEPUTY:  Yes.  You'll each have a

2    room out there.  There will be a sign.

3          MR. ANDREWS:  Thank you.

4          THE COURT:  Anything else?  Nope, we're good?

5    All right.

6          I'll see everybody here, then, the morning of

7    the 25th unless you see me setting a status hearing, in

8    which case you know you got bumped, or if you decide to

9    consent to the magistrate judge.  All right?

10          All right, thanks.

11          MR. ANDREWS:  Thank you very much.

12          MS. LONG:  Thanks, Judge.

13          THE COURT:  Thanks.

14                    *(Hearing concludes, 11:01 a.m.)*

15

16    * * * * * * * * * * * * * * * * * * * * * * * * *

17

18                    REPORTER'S CERTIFICATE

19          I, LISA KNIGHT COSIMINI, RMR-CRR, hereby

20    certify that the foregoing is a correct transcript from

21    the record of proceedings in the above-entitled matter.

22          Dated this 12th day of June, 2024.

23

24          _____s/Lisa Knight Cosimini_____
                    Lisa Knight Cosimini, RMR-CRR
25                  Illinois License # 084-002998